[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Probate Div.*, Slip Opinion No. 2016-Ohio-7382.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2016-OHIO-7382

THE STATE EX REL. ALLEN COUNTY CHILDREN SERVICES BOARD *v*. MERCER COUNTY COMMON PLEAS COURT, PROBATE DIVISION, ET AL.

**[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *State ex rel. Allen Cty. Children Servs. Bd. v. Mercer Cty. Common Pleas Court, Probate Div.*, Slip Opinion No. 2016-Ohio-7382.]**

*Prohibition—Adoption—Probate court's authority to order preadoption placement pursuant to R.C. 5103.16(D) is within its exclusive, original jurisdiction over adoption proceedings even while child is subject to juvenile court's continuing jurisdiction—Probate court acted within its jurisdiction and in accordance with statutory authority in placing child for adoption with foster parents with mother's consent—Reconsideration granted, peremptory writ rescinded, and writ denied.*

(No. 2016-0723—Submitted August 31, 2016—Decided October 20, 2016.)

IN PROHIBITION.

_____

**O'DONNELL, J.**

{¶ 1} The issue in this case is whether a probate court may exercise its *exclusive* jurisdiction over adoption proceedings while a juvenile court is concurrently exercising *continuing* jurisdiction over a child custody proceeding.

{¶ 2} The Allen County Children Services Board ("Board") commenced this action seeking a writ of prohibition barring the Probate Division of the Mercer County Common Pleas Court ("Probate Court") and Judges Mary Pat Zitter and James Rapp from exercising jurisdiction over M.S., a minor child.[1] At that time, the child was in the temporary custody of the Board by order of the Juvenile Division of the Allen County Common Pleas Court ("Juvenile Court"). The Probate Court and the Juvenile Court both assert jurisdiction over the child's residential placement.

{¶ 3} On June 1, 2016, this court granted a peremptory writ of prohibition precluding the Probate Court from "exercising jurisdiction in the case captioned *In the Matter of the Placement and Adoption of M.A.S.A.*, Mercer County Common Pleas Court, Probate Division, case No. 2016 5005, consistent with the opinion to follow." 146 Ohio St.3d 1404, 2016-Ohio-3255, 50 N.E.3d 571. Before this court issued an opinion, the Probate Court and Judges Zitter and Rapp moved for reconsideration.

{¶ 4} We grant the motion for reconsideration, hold that the Probate Court acted within its jurisdiction and in accordance with its statutory authority in placing M.S. for adoption with Brian and Kelly Anderson with the consent of her mother, and rescind the peremptory writ of prohibition issued on June 1, 2016. Accordingly, for the reasons stated in this opinion, we deny the requested writ.[2]

---

[1] Judge Zitter is a common pleas judge in Mercer County. Judge Rapp is presiding over the case pursuant to assignment No. 16JA0734 by the chief justice, effective April 1, 2016.
[2] Based on this disposition, we deny the motion for leave to supplement the motion for reconsideration as moot.

**Facts and Procedural History**

{¶ 5} M.S. was born on July 24, 2014, and she tested positive for cocaine at or about the time of her birth. On August 7, 2014, the Board removed the child from her mother pursuant to an ex parte emergency custody order and placed her in the foster care of Brian and Kelly Anderson.

{¶ 6} At a hearing on August 8, 2014, the Juvenile Court found probable cause to believe that M.S. was subject to immediate harm from abuse or neglect and placed her in the shelter care of the Board. After the Board filed a dependency complaint on M.S.'s behalf, the Juvenile Court declared her to be dependent and abused and subsequently ordered the child placed in the temporary custody of the Board.

{¶ 7} On November 13, 2015, the Andersons moved to intervene in the Juvenile Court case and sought legal custody of M.S. That same day, M.S.'s mother filed a document agreeing to the Andersons' intervention and objecting to any plan that would place M.S. in the care or custody of the mother's sister, who resides in Indiana and has custody of M.S.'s half-brother by order of a West Virginia court. The Board on January 4, 2016, moved to modify the temporary-custody order and place M.S. in the legal custody of M.S.'s aunt and to terminate "all Court-ordered services" by the Board. In response, M.S.'s mother asked the court to designate the Andersons as legal custodians.

{¶ 8} On or about March 16, 2016, the Board removed M.S. from the Andersons' home and placed her with her aunt.

{¶ 9} On March 28, 2016, M.S.'s mother filed an application in the Probate Court, asking the court to place M.S. "for the purpose of adoption" with the Andersons. The Andersons petitioned the Probate Court to adopt M.S. on March 31, 2016, submitting an application for placement for the purpose of adoption signed by M.S.'s mother, who appeared before the Probate Court and executed her consent to the adoption. The Probate Court approved the application for placement

that same day and ordered the Board to release M.S. to the custody of the Andersons' attorney.

{¶ 10} In response to this order, the Board filed an emergency ex parte motion in the Juvenile Court seeking an order preventing removal of the child from her current placement. On April 1, 2016, the Juvenile Court granted the motion, asserting exclusive, original, and continuing jurisdiction over the child. It also denied the Andersons' motion to intervene in the Juvenile Court case, stating that "[f]oster parents have no right under the rules of juvenile procedure to participate as parties in the adjudication of the rights of natural parents." The Juvenile Court expressed concern that the Andersons, who as foster parents serve as agents of the Board, were instead "acting as independent free agents and well outside their role as caregivers" by contemplating adoption of the child despite the Board's goal of placing her in the legal custody of her aunt.

{¶ 11} Based on the Juvenile Court's order, the Board did not release the child and instead moved to stay proceedings in the Probate Court. The Andersons then sought to have the Board held in contempt of court for its failure to surrender custody of M.S. as ordered.

{¶ 12} Meanwhile, on April 26, 2016, the Juvenile Court denied the Andersons' renewed motion to intervene. In its order, the court quoted *In re Adoption of Asente*, 90 Ohio St.3d 91, 92, 734 N.E.2d 1224 (2000), for "the bedrock proposition that once a court of competent jurisdiction has begun the task of deciding the long-term fate of a child, all other courts are to refrain from exercising jurisdiction over that matter." It then observed that the Juvenile Court exercised jurisdiction over the child first, that it was exercising its continuing jurisdiction under R.C. 2151.415(E) and there were "two separate motions relating to the custody of the Child" pending, and that the Probate Court's approval of a placement for adoption did not confer party status on the Andersons in the Juvenile Court.

**{¶ 13}** On April 27, 2016, the Probate Court ruled that it had jurisdiction to proceed with the adoption, denied the Board's motion for stay, scheduled a hearing on the motion for contempt, and set the adoption petition for final hearing.

**{¶ 14}** The Board filed this complaint for a writ of prohibition against the Probate Court and Judges Zitter and Rapp on May 10, 2016. This court granted a peremptory writ of prohibition on June 1, 2016, with an opinion to follow announcement of the decision. 146 Ohio St.3d 1404, 2016-Ohio-3255, 50 N.E.3d 571.

**{¶ 15}** It is not clear what actions, if any, the Juvenile Court has taken since release of our decision in this case. Pursuant to R.C. 2151.415(D)(4), the Juvenile Court's temporary-custody order would have expired, at the latest, on August 8, 2016, which is two years from the date of the shelter-care order.

**{¶ 16}** The Probate Court and Judges Zitter and Rapp now seek reconsideration of our June 1, 2016 entry, asserting that prohibiting the Probate Court from exercising jurisdiction has deprived M.S.'s mother of her constitutional rights, that Ohio law provides for the Juvenile Court and the Probate Court to have concurrent jurisdiction in these circumstances, and that the adoption statutes were intended to ensure the child a permanent home in an expeditious manner. They contend that until the Board has terminated parental rights, it has no right to select the adoptive family for the child, because the adoption statutes expressly provide that parents retain the right to consent to an adoption notwithstanding the grant of temporary custody to the Board. They contend that granting the writ in this case has therefore prevented M.S.'s mother from exercising her residual rights.

**{¶ 17}** The Board responds that this court's writ did not affect the mother's right to consent to an adoption but rather reflected that the Juvenile Court had authority to divest her of the right to decide where M.S. will live once it found that M.S. was an abused, neglected, or dependent child. The Board asserts that the mother has not been deprived of due process, because the Revised Code precludes

the Probate Court from adjudicating an adoption petition only while M.S. is subject to the Juvenile Court's temporary-custody order. The Board notes that it is not necessary for M.S. to be adopted in order to provide her a permanent and stable home, because a grant of legal custody to her biological aunt may be in the child's best interest. And it asserts that this court should not permit "a biological parent who has failed to adequately care for his/her children and who does not like the decisions of the public children services agency and the juvenile court to collude with others to adopt the very same children who the parents have abused, neglected, or caused to be dependent."

{¶ 18} Accordingly, we are called upon to reconcile the conflicting claims of jurisdiction asserted by the Juvenile Court and the Probate Court.

### Law and Analysis

{¶ 19} To be entitled to a writ of prohibition, the Board must establish the exercise of judicial power, that the exercise of that power is unauthorized by law, and that denying the writ would result in injury for which no adequate remedy exists in the ordinary course of law. *State ex rel. Elder v. Camplese*, 144 Ohio St.3d 89, 2015-Ohio-3628, 40 N.E.3d 1138, ¶ 13. Even if an adequate remedy exists, a writ may be appropriate when the lack of jurisdiction is patent and unambiguous. *State ex rel. V.K.B. v. Smith*, 138 Ohio St.3d 84, 2013-Ohio-5477, 3 N.E.3d 1184, ¶ 9.

{¶ 20} The Board contends that the Probate Court's exercise of jurisdiction is unauthorized by law because the Juvenile Court has original, exclusive jurisdiction over M.S.

{¶ 21} A juvenile court has "exclusive original jurisdiction * * * [c]oncerning any child who on or about the date specified in the complaint * * * is alleged * * * to be a * * * delinquent, unruly, abused, neglected, or dependent child." R.C. 2151.23(A)(1). The juvenile court must hold an adjudicatory hearing—generally within 30 days after the complaint was filed—to determine whether the child is abused, neglected, or dependent. R.C. 2151.28(A)(2) and (B).

If it determines that the child is an abused, neglected, or dependent child, the court must hold a dispositional hearing within 30 days after the adjudicatory hearing and within 90 days after the complaint was filed. R.C. 2151.28(B)(3) and 2151.35(A)(1) and (B)(1). Following the dispositional hearing, the court must issue one of the dispositional orders authorized by R.C. 2151.353(A), which include: (1) committing the child to the temporary custody of a public children-services agency, a private child-placing agency, a parent, a relative, or a probation officer, (2) awarding legal custody to either parent or a person who moves for legal custody prior to the dispositional hearing, or (3) committing the child to the permanent custody of a public children-services agency or private child-placing agency. R.C. 2151.353(A)(2) through (4).

{¶ 22} The juvenile court "shall retain jurisdiction over any child for whom the court issues an order of disposition" pursuant to R.C. 2151.353(A) until the child reaches the age of 18 or 21 years or until "the child is adopted and a final decree of adoption is issued." R.C. 2151.353(F)(1). The retained jurisdiction following a dispositional order issued pursuant to R.C. 2151.353(A)—including an order of temporary custody under R.C. 2151.353(A)(2)—is "continuing jurisdiction," R.C. 2151.417(B), subject to termination by an adoption decree.

{¶ 23} Thus, a juvenile court's exclusive jurisdiction terminates upon the issuance of a dispositional order pursuant to R.C. 2151.353(A). At that time, the juvenile court will have conducted at least two hearings, adjudicated the child an abused, neglected, or dependent child, issued a disposition, and retained continuing jurisdiction pursuant to R.C. 2151.353(F)(1) and 2151.417(B). The fact that temporary custody cannot extend beyond two years, *see* R.C. 2151.415(D)(4), does not alter the nature of the continuing jurisdiction remaining with a juvenile court that issues a disposition of temporary custody. The Juvenile Court's exclusive jurisdiction over M.S. granted by R.C. 2151.23(A)(1) therefore ended after it adjudicated her an abused, neglected, or dependent child and issued a disposition

of temporary custody, and it is now exercising continuing jurisdiction over the child.

{¶ 24} In contrast to the juvenile court's continuing jurisdiction over an abused, neglected, or dependent child, "the original and exclusive jurisdiction over adoption proceedings is vested in the probate court," *In re Adoption of Pushcar*, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, ¶ 9, and the adoption statutes broadly permit "[a]ny minor" to be adopted by "[a] husband and wife together, at least one of whom is an adult," R.C. 3107.02(A) and 3107.03(A).

{¶ 25} A prerequisite to adoption is the placement of the child with the prospective adoptive parents. *See* R.C. 3107.051(A) (requiring filing of adoption petition within 90 days after the child is placed in the petitioner's home); R.C. 3107.11(A) (stating that adoption hearing may take place 30 days after the child is placed with the petitioner). Generally, only a public children-services agency or a state-certified child-placement institution or association may place a child for adoption. R.C. 5103.16(D). Here, no public children-services agency or state-certified child-placement institution or association placed M.S. for adoption with the Andersons.

{¶ 26} However, R.C. 5103.16(D)(1) permits the parent or parents of a child to arrange a private adoption without going through an authorized agency by appearing personally and applying to the probate court for approval of a proposed adoptive placement. Upon application, and if other statutory conditions are met, the probate court may approve the placement, R.C. 5103.16(D)(1) through (3), at which time "the prospective adoptive parent with whom the child is placed has care, custody, and control of the child pending further order of the court," R.C. 5103.16(D).

{¶ 27} After 30 days following the date on which the child was placed in the home of the petitioner, the probate court must conduct a hearing. R.C. 3107.11(A). If all required consents have been obtained and the adoption is in the

best interest of the child, then the court may issue a final or interlocutory decree of adoption. R.C. 3107.14(C). An interlocutory decree permits further observation and investigation of the adoptive home to determine the suitability of the adoptive parents, *id*., and a final decree terminates the parental rights of both parents, R.C. 3107.15(A)(1). If the probate court does not approve the adoption, its options include returning the child to the agency or person that had custody prior to the filing of the adoption petition or certifying the matter to the juvenile court "for appropriate action and disposition." R.C. 3107.14(D).

{¶ 28} We have recognized that a parent need not have physical custody of the child to utilize the procedure for private adoptive placement in R.C. 5103.16(D). *In re Adoption of J.A.S.*, 126 Ohio St.3d 145, 2010-Ohio-3270, 931 N.E.2d 554, ¶ 21 ("Although the statute requires the biological parents to seek court approval of placement, this does not mean that the children must physically be with the biological parents in order for them to file").

{¶ 29} Rather, the parent's right to consent to an adoption of a child subject to the juvenile court's continuing jurisdiction depends on the dispositional order that the court entered and whether it grants temporary or permanent legal custody.

{¶ 30} "Temporary custody" means "legal custody of a child who is removed from the child's home, which custody may be terminated at any time at the discretion of the court * * *." R.C. 2151.011(B)(56).

{¶ 31} "Legal custody" is "a legal status that vests in the custodian the right to have physical care and control of the child and to determine where and with whom the child shall live, and the right and duty to protect, train, and discipline the child and to provide the child with food, shelter, education, and medical care, all *subject to any residual parental rights*, privileges, and responsibilities." (Emphasis added.) R.C. 2151.011(B)(21). In turn, "residual parental rights, privileges, and responsibilities" is defined to mean "those rights, privileges, and responsibilities remaining with the natural parent after the transfer of legal custody of the child,

including, but not necessarily limited to, the privilege of reasonable visitation, *consent to adoption*, the privilege to determine the child's religious affiliation, and the responsibility for support." (Emphasis added.) R.C. 2151.011(B)(49).

{¶ 32} "Permanent custody" is different from legal custody. It means "a legal status that vests in a public children services agency or a private child placing agency, all parental rights, duties, and obligations, *including the right to consent to adoption*, and divests the natural parents or adoptive parents of all parental rights, privileges, and obligations, *including all residual rights* and obligations." (Emphasis added.) R.C. 2151.011(B)(32).

{¶ 33} As we recognized in *In re C.R.*, 108 Ohio St.3d 369, 2006-Ohio-1191, 843 N.E.2d 1188, "[t]he important distinction is that an award of legal custody of a child *does not* divest parents of their residual parental rights, privileges, and responsibilities." (Emphasis added.) *Id*. at ¶ 17. Legal custody is "subject to" residual parental rights, which include the parents' right to consent to an adoption, and the phrase "subject to" denotes "a contingent relation" that may be "conditioned, affected, or modified in some indicated way," *Webster's Third New International Dictionary* 2275 (1986). Thus, a third-party takes legal custody of a child *subject to* a parent's residual right to consent to an adoption, and the exercise of the right to consent to adoption necessarily affects a temporary legal custodian's right to determine the child's placement.

{¶ 34} Importantly, nothing in the statutes expressly precludes the probate court from exercising its jurisdiction in adoption proceedings regarding a child who is the subject of custody proceedings in the juvenile court. Rather, because R.C. 2151.353(F)(1) provides that a final adoption decree terminates the juvenile court's jurisdiction, the General Assembly necessarily granted the probate court jurisdiction to conduct adoption proceedings during the pendency of custody proceedings in the juvenile court.

**{¶ 35}** Moreover, in contrast to the right the statute grants to parents, the legislature has not granted temporary legal custodians a statutory right to consent to an adoption. Had the legislature intended a temporary dispositional order to be a barrier to adoption in these circumstances, it could have required the consent of the temporary custodian or the juvenile court, but it did not. And although a prospective adoptive parent need not obtain consent from "[a]ny guardian, custodian, or other party who has temporary custody of the child," R.C. 3107.07(L), a temporary custodian *is* entitled to notice from the probate court of a hearing on an adoption petition, R.C. 3107.11(A)(3). Thus, the General Assembly envisioned that adoption proceedings may overlap with juvenile court proceedings when a temporary custody order is in place.

**{¶ 36}** Accordingly, the authority of the probate court to order preadoption placement pursuant to R.C. 5103.16(D) is therefore within its exclusive, original jurisdiction over adoption proceedings, notwithstanding the fact that the child is subject to the continuing jurisdiction of the juvenile court.

**{¶ 37}** This view is consistent with our decision in *Pushcar*, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, which held that "[w]hen an issue concerning parenting of a minor is pending in the juvenile court, a probate court must refrain from proceeding with the adoption of that child," *id.* at the syllabus. Notably, we did not hold that the probate court lacked jurisdiction—*Pushcar* was not a prohibition action, and we did not question the appellate court's recognition that "the probate court did have jurisdiction to consider the petition for adoption," *id*. at ¶ 7. Rather, the point in *Pushcar* was that pursuant to the adoption statutes, the probate court could not proceed with the adoption without the consent of the putative father, and only the juvenile court could decide the question of the child's paternity. *See generally* R.C. 2151.23(B)(2) and 3111.06. We therefore concluded that "the probate court should have *deferred* to the juvenile court and *refrained*

from proceeding with the adoption petition until the juvenile court had adjudicated the pending matter." (Emphasis added.) *Pushcar* at ¶ 14.

{¶ 38} Notably, we have since clarified in *In re G.T.B.*, 128 Ohio St.3d 502, 2011-Ohio-1789, 947 N.E.2d 166, ¶ 10 and fn. 2, that *Pushcar* required the probate court to refrain from proceeding while there was a question of *parentage*—i.e., paternity—pending in the juvenile court.

{¶ 39} Nor is our holding that the Probate Court has jurisdiction to proceed in this matter inconsistent with this court's decision in *Asente*, 90 Ohio St.3d 91, 734 N.E.2d 1224. There, we stated that it was a "bedrock proposition that once a court of competent jurisdiction has begun the task of deciding the long-term fate of a child, all other courts are to refrain from exercising jurisdiction over that matter." *Id.* at 92. However, *Asente* concerned an interstate custody dispute and the application of the former Uniform Child Custody Jurisdiction Act and the Parental Kidnapping Protection Act to determine whether Kentucky or Ohio had jurisdiction over a child, because the courts of only one state, the child's "home state," had *exclusive* jurisdiction over child-custody proceedings. This case involves different statutes that grant the probate court jurisdiction to proceed on the adoption of abused and dependent children who are the subject of a temporary-custody order and the continuing jurisdiction of the juvenile court. Thus, *Asente* does not guide our decision in this case.

{¶ 40} Here, the Juvenile Court exercised exclusive jurisdiction over M.S. when it adjudicated her a dependent and abused child and when it issued a dispositional order awarding temporary custody of M.S. to the Board. Thereafter, the Juvenile Court retained continuing jurisdiction, which will terminate when M.S. reaches the age of 18 or 21 or when she is adopted, *see* R.C. 2151.353(F)(1). The Juvenile Court's continuing jurisdiction does not, however, divest the Probate Court of its exclusive, original jurisdiction over adoption proceedings. And M.S.'s mother's residual parental right to consent to adoption and preadoption placement

therefore supersedes the Board's right to decide M.S.'s residential placement as part of its temporary custody.

**{¶ 41}** Accordingly, we recognize that the Probate Court has jurisdiction to consider the adoption of M.S., and we therefore rescind the peremptory writ of prohibition issued on June 1, 2016, and deny the requested writ.

*Motion for reconsideration granted and writ denied.*

PFEIFER, LANZINGER, and FRENCH, JJ., concur.

O'CONNOR, C.J., dissents, with an opinion joined by O'NEILL, J.

O'NEILL, J., dissents, with an opinion joined by O'CONNOR, C.J.

KENNEDY, J., not participating.

_____

**O'CONNOR, C.J., dissenting.**

**{¶ 42}** To achieve the result it desires in this case, the new majority reframes the question in such a way that it can be answered only in the affirmative: "The issue in this case is whether a probate court may exercise its *exclusive* jurisdiction over adoption proceedings while a juvenile court is concurrently exercising *continuing* jurisdiction over a child custody proceeding." (Emphasis sic.) Majority opinion at ¶ 1.

**{¶ 43}** The actual question before us, however, is whether a probate court may exercise its exclusive jurisdiction over adoption proceedings while a juvenile court is exercising *its* exclusive jurisdiction over a child-custody proceeding. The answer to this question is, as it was when we first considered this case, "no." 146 Ohio St.3d 1404, 2016-Ohio-3255, 50 N.E.3d 571.

**{¶ 44}** As set forth in our rules, "A motion for reconsideration shall not constitute a reargument of the case * * *." S.Ct.Prac.R. 18.02(B). But respondents, the Probate Division of the Mercer County Court of Common Pleas ("Probate Court") and its judges Mary Pat Zitter and James Rapp, have offered no new fact

or legal argument that we failed to consider initially and, accordingly, their motion for reconsideration should fail. *See, e.g.*, *State ex rel. Shemo v. Mayfield Hts.*, 96 Ohio St.3d 379, 2002-Ohio-4905, 775 N.E.2d 493, ¶ 9; *Toledo Edison Co. v. Bryan*, 91 Ohio St.3d 1233, 1234, 742 N.E.2d 655 (2001) (Pfeifer, J., concurring).

{¶ 45} Without a word of explanation of how the onerous standard for granting a motion for reconsideration is met here, a majority of this court abandons this court's prior ruling, grants the motion to reconsider, and rescinds our previous writ of prohibition against respondents so that the Probate Court may proceed with the adoption of the minor child, M.S., by nonparties Brian and Kelly Anderson.

{¶ 46} It is one thing to ignore the standard for reconsideration. It is far more dangerous and disheartening, however, for the majority to ignore the realities of adjudicating cases of child abuse or neglect in Ohio's juvenile courts. Yet in its rush to permit the Andersons' adoption of M.S., the majority presents an unprecedented holding under the guise of statutory analysis. That analysis supports the majority's bottom line but casts aside every practitioner's understanding of Ohio's previously well-functioning juvenile court system, which must both protect dependent, neglected, and abused children and respect the fundamental constitutional rights of their parents.

{¶ 47} At best, the majority fails to understand the significant differences between the early stages of a child-abuse, neglect, or dependency action and the latter stages of such an action. The focus in the initial stages is on ascertaining whether the child has been imperiled and, if so, what orders must be entered immediately to protect the child. During the latter stages of the proceedings, the court must determine whether a parent's misconduct contributed to the child's peril and warrants the termination of the parent's rights to continued custody and care of the child. *See In re Bishop*, 36 Ohio App.3d 123, 124, 521 N.E.2d 838 (5th Dist.1987) (noting that the focus of a dependency charge is on the child and the

14

child's conditions, and not on the child's parents' faults); Giannelli and Salvador, *Ohio Juvenile Law*, Section 43:2, at 578 (2015 Ed.).

{¶ 48} Before proceeding with an explanation of the failings of the majority's statutory analysis and its sophistry with notions of juvenile and probate courts' respective jurisdictions, I pause to address important factual points that are not mentioned, let alone addressed, by the majority but that should inform our understanding of this case.

### THE ANDERSONS' MISREPRESENTATIONS

{¶ 49} On March 31, 2016, the Andersons filed a petition for adoption of M.S. in the Mercer County Probate Court. They intentionally deceived, twice, in that application.[3]

{¶ 50} First, they asserted that M.S. "is living" in their home. In truth, M.S. was not living in the Andersons' home on that date; the Allen County Children Services Board ("the Agency") had removed M.S. from their home at least two weeks earlier, on or about March 16, 2016, and placed her with her aunt in Indiana.

{¶ 51} Second, the Andersons swore that M.S. had been placed in their home "for adoption" on August 7, 2014, by the Agency. In truth, M.S. had been placed in the Andersons' home pursuant to an ex parte emergency custody order two weeks after M.S.'s birth.

{¶ 52} Notably, M.S.'s emergency placement with the Andersons was precipitated by the fact that M.S. had tested positive for cocaine shortly after her birth. That test result, of course, was due to the child abuse M.S. suffered from her

---

[3] Standard Probate Form 18.0, Petition for Adoption of Minor, issued per Sup.R. 51, is in use in Mercer County. The petition form asks for the identity of the party with *permanent* custody as well as the name of the attorney who represented the minor and the name of the guardian ad litem in the *permanent*-custody proceedings, suggesting that the form was drafted with the expectation that an adoption petition will not be filed until a permanent-custody order is in place. The Andersons avoided this problem by striking through the word "permanent" on their petition and typing above it "temporary." This unilateral rewording of the adoption petition did nothing to change the requirement that a permanent-custody order be presented in order to show capacity to place the child and inform the probate court as to whose consent is necessary to an adoption.

mother's use of cocaine during her pregnancy. *See In re Baby Boy Blackshear*, 90 Ohio St.3d 197, 736 N.E.2d 462, syllabus (a newborn baby who was exposed while a fetus to an illegal substance like cocaine is per se an abused child). Whether M.S.'s mother's cocaine use was due to an inability to resolve an addiction or an unwillingness to abstain is not clear, but this was not her first experience with the juvenile court system due to concerns over her parenting.[4] And her misconduct with M.S. alone was enough to establish that M.S.'s mother was not a suitable parent, and there is no showing that she is now suitable even though parental suitability is a necessary prerequisite to custody. *In re Perales*, 52 Ohio St.2d 89, 369 N.E.2d 1047 (1977), syllabus; *see Clark v. Bayer*, 32 Ohio St. 299 (1877), paragraph one of the syllabus.

{¶ 53} In any event, there is not a scintilla of evidence in the record suggesting, yet alone establishing, that M.S. was placed with the Andersons with an eye toward adoption. Nor should there be.

{¶ 54} Significantly, at the time the Agency placed M.S. with the Andersons, it had an obligation to protect the child but work toward her reunification with her mother. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 28-33. And the Andersons, as foster parents, also were obliged to strive for reunification of mother and child. *See In re R.W.*, 2015-Ohio-1031, 30 N.E.3d 254, ¶ 17 (8th Dist.) (noting that foster parents act as agents of the state). Instead, as the Juvenile Division of the Allen County Court of Common Pleas ("Juvenile Court") found, the Andersons began "acting as independent free agents and well outside their role as caregivers," by contemplating adoption of the child despite the Agency's goal of placing M.S. in the legal custody of her aunt—a placement consistent with Ohio's public policy favoring placement with a relative

---

[4]Although the circumstances are not before us, a West Virginia court previously awarded custody of M.S.'s half-sibling to M.S.'s aunt, who currently has physical custody of M.S.

or family member over placement in foster care,[5] Ohio Adm.Code 5101:2-42-05(E) and (F).

{¶ 55} Notwithstanding M.S.'s mother's parental unsuitability and per se abuse of M.S. or the fact that she retains only residual parental rights that do not permit her to control M.S.'s adoption, the majority nevertheless finds that her consent to the Andersons' adoption of M.S. is sufficient to destroy the Juvenile Court's exclusive jurisdiction and to permit the Probate Court to proceed with the Andersons' adoption petition, even if it contains lies or, at best, self-defeating statements.[6]

{¶ 56} The tragedy wrought by the majority's holding may or may not befall M.S. But it will certainly befall many of the neglected or abused children whom the law entrusts to our juvenile courts, the attorneys and guardians who represent those children, and the judges who preside over their cases. That docket is not an insignificant one: last year, there were nearly 22,000 cases of abuse, neglect, or dependency on the dockets of Ohio's juvenile courts. Supreme Court of Ohio, *2015 Ohio Courts Statistical Report* 125, available at http://www.supremecourt.ohio.gov/Publications/annrep/15OCSR/2015OCSR.pdf (accessed Sept. 14, 2016).

---

[5] On November 13, 2015, the Andersons moved to be made parties to the Juvenile Court case and for legal custody of M.S. On the same day, M.S.'s mother expressed her consent to intervention by the Andersons and voiced objection to any plan that would place M.S. in the care or custody of M.S.'s aunt. The Juvenile Court expressed concern that the Andersons, who as foster parents serve as agents of the Agency, were improperly "acting as independent free agents and well outside their role as caregivers" by hiring a private investigator, retaining a psychologist to offer expert testimony, and contemplating adoption of the child fostered with them despite the Agency's goal of placing the child in the legal custody of her aunt. The Juvenile Court properly denied the Andersons' motion to intervene, because "[f]oster parents have no right under the rules of juvenile procedure to participate as parties in the adjudication of the rights of natural parents."

[6] At a minimum, the petition filed in the Probate Court cannot serve as the petition that would actually grant adoption to the Andersons because it was untimely. R.C. 3107.051(A) (requiring that adoption petitions generally be filed within 90 days after the child is placed in the petitioner's home).

## ANALYSIS

*The proper understanding of a juvenile court's exclusive jurisdiction*

**{¶ 57}** The majority's analysis offends the General Assembly's equipoise of two sometimes-competing fundamental rights: a parent's right to the custody and care of her or his child and a child's right to be free from abuse and neglect.

**{¶ 58}** The rights of a parent may be fundamental, but they are not absolute. *Stanley v. Illinois*, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts*, 321 U.S. 158, 166, 64 S.Ct. 438, 88 L.Ed. 645 (1944); *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979). The state has broad authority to intervene to protect children from abuse and neglect. *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, at ¶ 28, citing R.C. 2151.01.

**{¶ 59}** As we have explained previously,

[u]ltimately, parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights. [*Cunningham* at 106.] [The child's] private interest, at least initially, mirrors his mother's, i.e., he has a substantial interest in preserving the natural family unit. But when remaining in the natural family unit would be harmful to him, [the child's] interest changes. His private interest then becomes a permanent placement in a stable, secure, and nurturing home without undue delay. *See In re Adoption of Zschach*, 75 Ohio St.3d 648, 651, 665 N.E.2d 1070 (1996). "There is little that can be as detrimental to a child's sound development as uncertainty over whether he is to remain in his current 'home,' under the care of his parents or foster parents, especially when such uncertainty is prolonged." *Lehman v. Lycoming Cty. Children's Servs. Agency,* 458 U.S. 502, 513-514, 102 S.Ct. 3231, 73 L.Ed.2d 928 (1982).

18

*In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 20.

{¶ 60} Because "[p]ermanent termination of parental rights has been described as the 'family law equivalent of the death penalty in a criminal case,' " parents " 'must be afforded every procedural and substantive protection the law allows' " before termination of a parent's rights. *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991). The General Assembly thus crafted an extensive and strict structural framework in the Revised Code for juvenile courts to follow in making a termination decision. *In re Z.R.*, 144 Ohio St.3d 380, 2015-Ohio-3306, 44 N.E.3d 239, ¶ 20 ("The General Assembly has made clear that the central purpose of the juvenile court system is '[t]o provide for the care, protection, and mental and physical development of children' "), quoting R.C. 2151.01(A); *In re T.R.*, 52 Ohio St.3d 6, 15, 556 N.E.2d 439 (1990) ("The mission of the juvenile court is to act as an insurer of the welfare of children and a provider of social and rehabilitative services"); *Children's Home of Marion Cty. v. Fetter*, 90 Ohio St. 110, 127, 106 N.E. 761 (1914) (recognizing that the legislature established the juvenile courts "in order to protect children"). The process of adjudicating a child-welfare case ensures the graduated restriction of parental rights in cases in which it is necessary to do so, typically starting with protective supervision of the child at home, then removal and temporary custody of the child outside the home.

{¶ 61} The process begins with the filing of the dependency complaint, which triggers the *exclusive* original jurisdiction of the juvenile court to adjudicate cases involving any child alleged to be abused, neglected, or dependent.[7] *In re*

---

[7] A dependent child is "essentially [one] whose 'condition or environment is such as to warrant the state, in the interests of the child, in assuming [the child's] guardianship.' " *State ex rel. Easterday v. Zieba*, 58 Ohio St.3d 251, 254, 569 N.E.2d 1028 (1991), fn. 1, quoting R.C. 2151.04(C).

*Z.R.* at ¶ 16; *State ex rel. Jean-Baptiste v. Kirsch*, 134 Ohio St.3d 421, 2012-Ohio-5697, 983 N.E.2d 302, ¶ 18, citing R.C. 2151.23(A)(1).

{¶ 62} Within 30 days of the filing of the complaint, the juvenile court must conduct an adjudicatory hearing to determine whether the child is abused, neglected, or dependent and whether the child should remain in (or be placed in) shelter care. R.C. 2151.28(A)(2) and (B). And the court must hold an additional hearing no more than 30 days after the adjudicatory hearing. R.C. 2151.35(B)(1).

{¶ 63} The court then has seven days in which to issue a judgment that includes one of six temporary or interim disposition orders, *see* R.C. 2151.353(A)(1) through (6). R.C. 2151.35(B)(3). Here, the Juvenile Court entered such an order by giving temporary custody of M.S. to the Agency.[8]

{¶ 64} R.C. 2151.353 expressly confers to the juvenile court the authority to "commit the child to the *temporary* custody of" a children-services or private child-placing agency. R.C. 2151.353(A)(1). Despite the fact that the Juvenile Court's order is for only *temporary* custody, the majority holds that the Juvenile Court's exclusive jurisdiction terminated at that point, and will always terminate at that point, regardless of which dispositional order a juvenile court elects. But the majority's conclusion is entirely arbitrary. Based on the analysis the majority proffers, the majority could just as easily have concluded that the juvenile court loses exclusive jurisdiction when it completes the adjudicatory hearing and declares the child dependent.

{¶ 65} Both conclusions are incorrect. In either scenario, the majority deprives the juvenile court of its exclusive jurisdiction to do the critical work the General Assembly charged to it—ensuring the safe care of the child—before that critical work is complete. The General Assembly plainly did not intend this result,

---

[8] The Agency filed a dependency complaint on M.S.'s behalf on August 11, 2014. The Juvenile Court declared her to be dependent and abused on October 8, 2014. On November 4, 2014, following a hearing, the court ordered M.S. placed in the temporary custody of the Agency.

because the scheme it created and placed in the Revised Code considers the final dispositional order in the abuse, neglect, or dependency case to be the judgment ending the juvenile court's adjudicatory process.

{¶ 66} A temporary-custody order is an interim disposition intended to serve only as a temporary, rather than final, disposition. We know this because the statutory language specifies that the temporary-custody order terminates one year after the complaint's filing or the child's placement in shelter care, whichever is earlier, R.C. 2151.353(G); that the agency receiving temporary custody must file, no later than 30 days before the temporary-custody order (or an extension) expires, a motion in the juvenile court seeking one or more final dispositional orders for the child, R.C. 2151.415(A); and that the juvenile court must schedule a hearing on the motion for final disposition in the very same dispositional order that creates the temporary custody, nearly a year before the hearing will occur, R.C. 2151.35(B)(3).

{¶ 67} In its rush to permit the Probate Court to assert its exclusive jurisdiction over a case pending in juvenile court, the majority ignores that temporary dispositions in juvenile court are just that: temporary, i.e., "not a determination of the merits of the complaints, but a temporary order pending determination of the merits of the complaint," *In re Spears*, 4th Dist. Athens No. 1200, 1984 WL 5682, *4 (Dec. 10, 1984). *See also Black's Law Dictionary* 1131 (8th Ed.2004) (defining "temporary order" as a "court order issued during the pendency of a suit, before the final order or judgment has been entered"). Those interim orders serve as temporal and substantive guideposts along the path of adjudicating parental rights in neglect and abuse cases, not final orders that resolve the rights of the parent and the child.

{¶ 68} The majority seizes on the fact that those guideposts are referred to as "dispositions" to summarily declare, without authority, that "[t]he retained jurisdiction following a dispositional order issued pursuant to R.C. 2151.353(A)— including an order of temporary custody under R.C. 2151.353(A)(2)—is

'continuing jurisdiction,' R.C. 2151.417(B), subject to termination by an adoption decree." Majority opinion at ¶ 22. In so holding, the majority ignores that the General Assembly extensively revised its statutory scheme in the late 1980s to provide specific deadlines for holding shelter-care, adjudicatory, dispositional, and other hearings in cases of child abuse, neglect, or dependency in order to protect children from languishing needlessly in the foster-care system. As one appellate court explained,

> [b]ecause of apparent dissatisfaction with the results of prior legislative efforts and in order to ensure Ohio's compliance with federal mandates, the General Assembly enacted Am.Sub.S.B. No. 89, effective January 1, 1989 (142 Ohio Laws, Part I, 198), which provided comprehensive changes in the laws governing neglect, dependency, and abuse proceedings. Kurtz & Giannelli, Ohio Juvenile Law (2 Ed.1989) 21, T 1.04. The overall intent of the legislation was to prevent "foster care drift" by, among other things, establishing maximum time limits under which children may remain in the custody of public and private child care agencies, and increasing the responsibilities of juvenile courts to review and oversee the permanency planning efforts of these agencies. *Id.* at 22; see, also, Legislative Service Commission Analysis of Am.Sub.S.B. 89, Baldwin's 1988 Laws of Ohio, at 5-5.71.

*In re Collier*, 85 Ohio App.3d 232, 235, 619 N.E.2d 503 (4th Dist.1993). *See also In re Murray*, 52 Ohio St.3d 155, 157-158, 556 N.E.2d 1169 (1990) (describing "the sweeping reforms made to the juvenile court system" by Am.Sub.S.B. No. 89, including amendments to R.C. 2151.353).

**{¶ 69}** The majority's conclusion that the Juvenile Court judges' interim dispositional orders end the Juvenile Court's exclusive, original jurisdiction is not supported by the legislative history of the 1989 amendments.

**{¶ 70}** Granted, there is an unfortunate lack of precision in the use of the term "disposition" in the legislative history, in which the term is used to denote both initial and final dispositions. *See, e.g.*, Legislative Service Commission Analysis of Sub.S.B. 89, as reported by H. Children & Youth (1989), at 21 and 37; Legislative Service Commission Analysis of Sub.S.B. 89, as passed by the Senate (1989), at 2 and 11-12. Given that lack of clarity, we should interpret the statute consistently with its purpose and with common sense and hold that the General Assembly intended that a juvenile court's final dispositional hearing and subsequent ruling serves as the culminating event that extinguishes a juvenile court's exclusive jurisdiction, and not the interim dispositions reflected in the juvenile court's temporary-custody orders.[9] After all, the final dispositional order of a juvenile court is the only order that could terminate parental rights and give rise to making a child available for adoption. (Here, of course, the Juvenile Court has not determined the status of the mother's rights to M.S.)

**{¶ 71}** Moreover, the majority ignores the significance of the very specific manner in which the statutory provisions it relies on were drafted, including the General Assembly's express mention of R.C. 2151.414 and 2151.415 in R.C. 2151.417(B).

---

[9] Our appellate courts often distinguish between the preliminary dispositions of temporary custody of the child as orders of "*temporary* disposition" rather than as final adjudications. (Emphasis added.) *E.g.*, *In re S.W.E.*, 8th Dist. Cuyahoga No. 91057, 2008-Ohio-4234, ¶ 12; *In re A.D.*, 8th Dist. Cuyahoga No. 87510, 2006-Ohio-6036, ¶ 11 and 16; *In re S.G. & M.G.*, 8th Dist. Cuyahoga No. 84228, 2005-Ohio-1163, ¶ 9-13 and 19; *In re Hale*, 2d Dist. Clark No. CA2163, 1986 WL 554, *3 (Oct. 16, 1986); *In re Miller*, 1st Dist. Hamilton No. C-830919, 1984 WL 7022, *1 (Oct. 24, 1984); *In re Parker*, 3d Dist. Van Wert No. 15-79-16, 1981 WL 6774, *1 (Jan. 26, 1981); *In re Feiler*, 1st Dist. Hamilton No. C-780549, 1979 WL 208767, *2 (Oct. 17, 1979). And our juvenile courts similarly characterize initial custody rulings as a "temporary disposition," *e.g.*, *In re A.A.*, 8th Dist. Cuyahoga No. 85002, 2005-Ohio-2618, ¶ 23, or as "pre-dispositional," *e.g., In re Hennen*, 11th Dist. Trumbull No. 2002-T-0028, 2002-Ohio-7282, ¶ 10.

**{¶ 72}** R.C. 2151.417(B) provides that if a juvenile court "issues a dispositional order *pursuant to R.C. 2151.353, 2151.414, or 2151.415*, the court has continuing jurisdiction over the child" until the child turns 18 or is adopted. (Emphasis added.) *See* R.C. 2151.353(F)(1). The juvenile court necessarily must have *continuing* jurisdiction for purposes of determinations made under the authority of R.C. 2151.353(F) in order to permit the juvenile court to continue considering the family—including the biological parents' progress with parenting skills that could lead to reunification with their child—before rendering a final disposition about the care and custody of the child.

**{¶ 73}** But what, then, is the relevance of R.C. 2151.414 and 2151.415? Under the majority's interpretation of the statute, there was no reason for the General Assembly to have referred to R.C. 2151.414 and 2151.415 in R.C. 2151.417(B) because children subject to orders issued under R.C. 2151.414 and 2151.415 would already be subject to the juvenile court's continuing jurisdiction by operation of the temporary orders issued under R.C. 2151.353. The majority's analysis ignores the General Assembly's express mention of R.C. 2151.414 and 2151.415 in R.C. 2151.417(B).

**{¶ 74}** When construing a statute, we must give effect to all the enacted language. *Church of God in N. Ohio, Inc. v. Levin*, 124 Ohio St.3d 36, 2009-Ohio-5939, 918 N.E.2d 981, ¶ 30. As we explained in *Boley v. Goodyear Tire & Rubber Co.*, a statutory construction that renders statutory words meaningless and without effect is an improper analysis. 125 Ohio St.3d 510, 2010-Ohio-2550, 929 N.E.2d 448, ¶ 21 (noting that the court's role is to evaluate a statute as a whole and interpret the statutory language in a way that gives effect to every word and clause in it, not treat any part as superfluous, and to avoid a construction that renders a provision meaningless or inoperative). *See also Weaver v. Edwin Shaw Hosp.*, 104 Ohio St.3d 390, 2004-Ohio-6549, 819 N.E.2d 1079, ¶ 13, citing *Wachendorf v. Shaver*, 149 Ohio St. 231, 78 N.E.2d 370 (1948), paragraph five of the syllabus (statutes

"may not be restricted, constricted, qualified, narrowed, enlarged or abridged; significance and effect should, if possible, be accorded to every word, phrase, sentence and part of an act").

{¶ 75} To be sure, the statutory scheme at issue here is labyrinth. But the complexity of the statutes is not an invitation to import our own judicial philosophies and preferences into the analysis. " ' "A court should not place a tenuous construction on [a] statute to address a problem to which the legislative attention is readily directed and which it can readily resolve if in its judgment it is an appropriate subject of legislation." ' " *State v. Gray*, 62 Ohio St.3d 514, 518, 584 N.E.2d 710 (1992), quoting *People v. Hardy*, 188 Mich.App. 305, 310, 469 N.W.2d 50 (1991), quoting *People v. Gilbert*, 414 Mich. 191, 212-213, 324 N.W.2d 834 (1982).

{¶ 76} Rather, our duty is to construe the statutes according to legislative intent, harmonizing them in a proper and reasonable fashion and giving the provisions their proper force and effect. *State v. South*, 144 Ohio St.3d 295, 2015-Ohio-3930, 42 N.E.3d 734, ¶ 29 (O'Connor, C.J., concurring), citing *D.A.B.E., Inc. v. Toledo–Lucas Cty. Bd. of Health*, 96 Ohio St.3d 250, 2002-Ohio-4172, 773 N.E.2d 536, ¶ 20; *State ex rel. Savarese v. Buckeye Local School Dist. Bd. of Edn.*, 74 Ohio St.3d 543, 545, 660 N.E.2d 463 (1996); and *State ex rel. Pratt v. Weygandt*, 164 Ohio St. 463, 132 N.E.2d 191 (1956), paragraph two of the syllabus.

{¶ 77} The General Assembly, having established a specific and mandatory process for both initial decisions about the protection of the child and those finalizing a juvenile court's judgment, clearly extended the juvenile court's exclusive jurisdiction through to the end of the juvenile court's adjudication process.[10] At *that* point, the juvenile court has continuing, but not exclusive, jurisdiction over the child. Neither a probate court nor a litigant in the probate court

---

[10] To be sure, interim dispositional orders *may* terminate a juvenile court's exclusive jurisdiction, depending on the order, *see* R.C. 2151.353(A)(5) and (6), but only in limited cases.

can deprive a juvenile court of its exclusive jurisdiction before final disposition. *State ex rel. Hitchcock v. Cuyahoga Cty. Court of Common Pleas, Probate Div.*, 97 Ohio App.3d 600, 604, 647 N.E.2d 208 (8th Dist.1994) ("If a court has exclusive jurisdiction over a proceeding, it is difficult to imagine how another court may divest it of the authority to hear such a proceeding").

*The proper understanding of a probate court's exclusive jurisdiction*

**{¶ 78}** There is no dispute that the probate courts have exclusive original jurisdiction over adoption proceedings. *In re Adoption of Pushcar*, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, ¶ 9; *State ex rel. Otten v. Henderson*, 129 Ohio St.3d 453, 2011-Ohio-4082, 953 N.E.2d 809, ¶ 21; *State ex rel. Portage Cty. Welfare Dept. v. Summers*, 38 Ohio St.2d 144, 311 N.E.2d 6 (1974), paragraph two of the syllabus.

**{¶ 79}** The process of adoption begins with the filing of a petition for adoption. R.C. 3107.05(A). Subject to exceptions, an adoption petition must be filed no later than 90 days after the date the minor is placed in the home of the person seeking to adopt the minor. R.C. 3107.051(A).

**{¶ 80}** The majority emphasizes that preadoption placement (that is, placement of the child before the final order of adoption) is governed by R.C. 5103.16(D). That section establishes a general rule that adoption placements must be made by a public children-services agency or other certified agency, subject to an exception: prior to the placement of the child, the parent or parents of the child may petition the probate court for approval of a specified placement, and if certain conditions are met, the probate court may order the placement. R.C. 5103.16(D)(1) through (3). "If the court approves a placement, the prospective adoptive parent with whom the child is placed has care, custody, and control of the child pending further order of the court." R.C. 5103.16(D).

**{¶ 81}** The majority seizes on this statutory scheme and summarily concludes that it is sufficient to permit the Probate Court to proceed with M.S.'s

adoption. And that might have been the case if M.S.'s mother had legal custody of M.S., because legal custody includes the right to control how and where a child shall live. R.C. 2151.011(B)(21). But M.S.'s mother does not have legal custody; she possesses only the residual rights set forth in R.C. 2151.011(B)(49), including the right to consent to an adoption.

**{¶ 82}** The right to consent to an adoption is not a right to control placement of the child pending adoption. Rather, it is a legislatively crafted protective measure that ensures that no adoption can be initiated without a biological parent's consent as long as a court of competent jurisdiction has not permanently terminated that parent's parental rights. For this reason, the consent of a biological parent with residual parental rights is, for a probate court, a jurisdictional prerequisite. R.C. 3107.06; *McGinty v. Jewish Children's Bur.*, 46 Ohio St.3d 159, 161, 545 N.E.2d 1272 (1989). But M.S.'s mother cannot unilaterally vest the Probate Court *with jurisdiction* it otherwise lacks *merely by consenting* to an adoption. *See In re Palmer*, 12 Ohio St.3d 194, 197, 465 N.E.2d 1312 (1984).

**{¶ 83}** I would hold, consistent with *Palmer*, that as long as a temporary-custody order is in effect, the parent of a child who has been declared dependent has no legal authority to direct the child's placement, whether by consenting to an adoption, a preadoption placement, or otherwise. Nevertheless, the judicial fiat rendered by the majority today expands the scope of residual parental rights, which evidently now permit a parent to control placement of the child and to divest a juvenile court of its exclusive jurisdiction to adjudicate a complaint that the parent abused or neglected her or his child.

**{¶ 84}** The majority does not cite a single case that actually supports that result.[11] The paucity of authority is not surprising, however, because until today, no such authority existed.

---

[11] Although the majority suggests that *Pushcar*, 110 Ohio St.3d 332, 2006-Ohio-4572, 853 N.E.2d 647, and *In re G.T.B.*, 128 Ohio St.3d 502, 2011-Ohio-1789, 947 N.E.2d 166, support its analysis,

**CONCLUSION**

**{¶ 85}** From this day forward, parents who face termination of their parental rights due to their suspected abuse or neglect of their children need not worry. To avoid the intruding eye of the juvenile court judge, the parent alleged to be abusive or neglectful can simply find a trusted ally or private adoption agency, then proceed to probate court, where the adoption can occur without any finality to the allegations of abuse or neglect. And once the adoption is final, nothing can be done to protect the child except, of course, return to juvenile court on a new dependency action. But child-protective services would be no more successful there than the daughters of Danaus for, upon arrival in juvenile court to face the allegations of abuse or neglect, the parent could simply abscond to probate court and again avoid adjudication.

**{¶ 86}** The majority's holding promotes the precise sort of turf war that has occurred in this case, to the detriment of M.S. We should be cognizant that we previously adopted as our own the words of then Judge O'Neill, albeit in a slightly different context, when he cautioned against permitting courts to be playing fields in which children are the pawns:

> The current litigation at this appellate level is not about good parents or bad parents. Further, this court is also not determining custody, an issue to be decided later by a court with competent jurisdiction. Rather, this court has a very solemn role to play, and that is to determine which court * * * has jurisdiction over this

---

that suggestion is dubious. If those cases stand for the proposition that a probate court must refrain from proceeding with an adoption while there is a question of parentage, how can they not support the notion that a probate court must refrain from proceeding with an adoption when there is a question of the parent's rights to the child? The result of this case would be the same under *Pushcar*: resolution of the three motions pending before the Juvenile Court will have a significant impact on the parental rights of M.S.'s biological mother, and therefore they concern the parentage of M.S.

matter. As this case demonstrates, the best interest of a child is never served when adults turn to seemingly endless litigation to resolve their disputes. In this case, the parties have staked out a position and have waited for the courts to schedule hearings where it is hoped that the Wisdom of Solomon will come down on the winning side. In the interim, the life of a child and two families are left in turmoil and uncertainty to no one's benefit. Litigation of these matters is already difficult when one court in one state is involved in the controversy. It becomes unwieldy when multiple [courts] become embroiled in the dispute and cannot agree on the basic issue of jurisdiction.

*In re Adoption of Asente*, 90 Ohio St.3d 91, 91-92, 734 N.E.2d 1224 (2000).

{¶ 87} The memories of the justices in the majority are evidently as limited as the majority opinion's analysis here.

{¶ 88} I dissent.

O'NEILL, J., concurs in the foregoing opinion.

_____

**O'NEILL, J., dissenting.**

{¶ 89} I join Chief Justice O'Connor's well-written dissent.

{¶ 90} I write separately to clarify what happens next. It is beyond dispute that there are at least two courts that can have exclusive jurisdiction over events that may occur in the fragile life of any child in Ohio. The juvenile court has exclusive jurisdiction over abuse, neglect, or dependency, and the probate court has exclusive jurisdiction should someone file a petition to adopt the child.

{¶ 91} No one disputes that when there is even a suggestion of abuse, neglect, or dependency, the juvenile court has not only the right but the duty to step in. At that point, the juvenile court's exclusive jurisdiction—to immediately take

charge of the situation and to protect the child from whatever dangers exist—is triggered. That is what happened here. A drug-exposed child was born in Allen County, and a children-services agency, exercising its statutory authority, immediately stepped in to protect the child. At birth. As we said in *In re Adoption of Asente*, "once a court of competent jurisdiction has begun the task of deciding the long-term fate of a child, all other courts are to refrain from exercising jurisdiction over that matter." 90 Ohio St.3d 91, 92, 734 N.E.2d 1224 (2000). Had someone instead filed an adoption petition at birth in this matter, indeed the same result would have followed. The probate court would then have exercised its exclusive jurisdiction, and all others in the free world would have been required to acquiesce in the probate court's exclusive jurisdiction. *Id.* at 104. In this case, the child was placed in the Andersons' home pursuant to an ex parte emergency custody order of the Allen County Juvenile Court on August 7, 2014, two weeks after the child's birth. On March 31, 2016, the Andersons filed a petition to adopt their foster child in Mercer County, where they lived. It is readily apparent that at the time the adoption petition was filed in a foreign county, the Allen County Juvenile Court was clearly exercising its exclusive jurisdiction to guarantee the safety and long-term stability of the child.

{¶ 92} At its core, that was the basis of the peremptory writ that we issued on June 1, 2016. We instructed the Mercer County Probate Court to refrain from acting until further notice, not forever. Just stop for now, and let the first court figure out what is happening here. Common sense, case precedents, and the statutory framework clearly support what this court did on an interim basis.

{¶ 93} Nowhere in our entry issuing the writ did we question the jurisdiction, wisdom, or motives of the Mercer County Probate Court. However, it is preposterous to even suggest that the birth mother, having first exposed her newborn to cocaine, would have the temerity on her own to wander across county lines and attempt to consent to her child being put up for adoption. Once the

juvenile court and the Allen County Children Services Board ("the Agency") became aware of the peril this child was in from the actions of this mother, they immediately commenced their statutorily mandated job of finding a safe home for this child.

{¶ 94} I write separately because I believe the majority does not adequately address the following salient facts, which are undisputed:

1. The mother is not the custodial parent of this child today.

2. The Agency had temporary legal custody of the child at the time we issued the peremptory writ.

3. The Agency was not named as a party in the Mercer County Probate Court's order for adoptive placement.

4. This child *is* a resident of Allen County, Ohio, living in Indiana. That is a fact that all the pleadings in the world will not change.

{¶ 95} On June 1, 2016, this court granted the peremptory writ of prohibition. 146 Ohio St.3d 1404, 2016-Ohio-3255, 50 N.E.3d 571. The Allen County Juvenile Court's temporary-custody order was set to expire by operation of law on August 8, 2016, at which time the exclusive jurisdiction of the juvenile court would have ended. With that statutory milestone crossed, that court still has continuing jurisdiction not inconsistent with the probate court's exclusive jurisdiction over any adoption that has been or will be filed. R.C. 2151.353(F)(1).

{¶ 96} As Chief Justice O'Connor points out, respondents, the Mercer County Probate Court and its judges, have offered no new fact or legal argument to warrant reconsideration. We got this case right the first time. A motion for reconsideration is not the vehicle by which a party should be permitted to reargue earlier positions. The motion to reconsider should be denied.

{¶ 97} I dissent.

O'CONNOR, C.J., concurs in the foregoing opinion.

_____

Juergen A. Waldick, Allen County Prosecuting Attorney, and Terri L. Kohlrieser, Assistant Prosecuting Attorney, for relator, Allen County Children Services Board.

Matthew K. Fox, Mercer County Prosecuting Attorney, and Amy B. Ikerd and Andrew J. Hinders, Assistant Prosecuting Attorneys, for respondents, Court of Common Pleas of Mercer County, Probate Division, Judge Mary Pat Zitter, and Judge James Rapp.

David W. Haverfield, urging denial of the motion for reconsideration for amicus curiae, Public Children Services of Ohio.

_____